IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

PEREZ YAX V. PACKERS SANITATION SERVS.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

ELVIA PEREZ YAX, APPELLEE AND CROSS-APPELLANT,

V.

PACKERS SANITATION SERVICES, INC., LTD., EMPLOYER, AND INDEMNITY INSURANCE COMPANY
OF NORTH AMERICA, INSURANCE CARRIER, APPELLANTS AND CROSS-APPELLEES.

Filed June 30, 2026.    No. A-25-812.

Appeal from the Workers' Compensation Court: DIRK V. BLOCK, Judge. Affirmed in part, and in part remanded with directions.

Jenny L. Plager, of Caswell, Plager & Westerhold, L.L.C., for appellants.

Cathy S. Trent-Vilim and Rachel R. Raymond, of Lamson, Dugan & Murray, L.L.P., and Dennis McElwain for appellee.

RIEDMANN, Chief Judge, and BISHOP and FREEMAN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Elvia Perez Yax filed an action in the Nebraska Workers' Compensation Court against Packers Sanitation Services, Inc., Ltd., and Indemnity Insurance Company of North America (hereafter collectively referred to as "Packers"), claiming that she sustained injuries to her left hand and fingers in an accident arising out of and in the course of her employment with Packers. However, Packers alleged that Elvia's injuries were caused by or resulted from her willful negligence and violation of the employer's reasonable safety rules. After a trial, the compensation court entered an award in Elvia's favor. It awarded her temporary total disability, permanent partial disability, medical expenses, future medical care, a 50-percent waiting-time penalty, $22,250 in attorney fees, and interest.

- 1 -

Packers appeals the compensation court's award of a penalty, attorney fees, and interest, claiming there was a reasonable controversy as to Elvia's entitlement to benefits. In her cross-appeal, Elvia claims the court should have also awarded her costs. We affirm the compensation court's award in favor of Elvia, including the award of waiting-time penalties, attorney fees, and interest. However, we remand the matter to the compensation court with directions to further award Elvia her permissible costs.

## II. BACKGROUND

Packers provided sanitation services to Smithfield Foods in Crete, Nebraska. On August 30, 2024, while working for Packers, Elvia was cleaning a bacon press when her left hand was caught in a moving conveyor belt. As a result of the crush injury, two of her fingers had to be surgically amputated. Packers subsequently terminated Elvia's employment for violating its safety rules and paid no workers' compensation indemnity benefits to her.

On November 13, 2024, Elvia filed a petition in the compensation court alleging that she sustained injuries to her left hand and fingers in an accident arising out of and in the course of her employment with Packers on August 30. She sought temporary and permanent indemnity benefits, future medical care, vocational rehabilitation, waiting-time payments, interest, and attorney fees. She requested "such benefits to which she is entitled under Nebraska law."

In response, Packers alleged that Elvia's injuries were caused by or resulted from her willful negligence and violation of the employer's reasonable safety rules. Packers further alleged that if Elvia suffered any disability, it did not arise out of or in the course of her employment by Packers.

### 1. TRIAL

Trial was held on June 4, 2025. Witnesses testified and numerous exhibits were received into evidence.

According to Packers' Employee Safety Handbook, Packers "requires all team members to maintain a safe distance ([m]inimum arm's length) when working around running equipment." Anytime a team member is working within arm's length of an operational pinch point, the equipment must be locked out. And "lockout/tagout must be used anytime a team member must cross the plane of operation or put any part of his/her body past the point of operation." "Lockout/tagout" (sometimes referred to as "LOTO") is "a procedure to render equipment totally inoperative and apply a lockout device to ensure the power remains off." The handbook also states, "In this industry it may be occasionally necessary to clean equipment or machinery while the equipment is running," and "[i]n these cases Packers team members shall maintain a **Safe Distance** ([m]inimum arm's length) from the point of operation." (Emphasis in original.)

Elvia, 41 years old, testified via a court-certified interpreter. Elvia worked for Packers from 2015 until 2022 or 2023, and then again beginning in May 2023. All of her work for Packers was performed at the Smithfield Foods meat packing plant in Crete.

During her first period of employment, Elvia worked on "the kill floor," "the channel where the blood goes," and used a high-pressured hose to clean the area. When asked if she was working around moving equipment during that period of employment, Elvia responded, "No." She did not report any work injuries and was never disciplined for violating any rules.

During her second period of employment that began in May 2023, Elvia worked third shift, from 11 p.m. to 6 a.m., in the bacon press area. Elvia said, "[W]e had to wait until the last person would leave . . . [s]o would actually start cleaning about 2:00 in the morning" and had to be done by 5 or 5:30 a.m. If she was not done cleaning on time, she would be "scolded because that means that the plant will be behind, they can't start on time."

Elvia was trained on presses 5 and 6. "They would give us a month to train, but in two weeks, we had to start doing the job." During training, "they told me how to lock the machine, how to unassemble, how to wash all the parts and everything." She used a high-pressure hose to clean the belts. She worked on presses 5 and 6 for a "few months."

When Elvia moved to presses 1 and 2, she was trained for "one night." The belts rotated in a clockwise direction and had two levels; the top level was a little below her chest level, and the bottom level was a little more than midway between her knee and hip joint. A high-pressured hose was used to wash both the top and bottom levels, and the belt had to be running while being cleaned. There was a belt with the sprockets exposed on top (the roller was on top of the belt).

Elvia said, "I always was scared when it was always running because something could happen to me . . . because those belts were not locked," "[i]t was not safe." "Sometimes I would shut it off because I was scared it was dangerous," but the supervisor "would get upset if I did that." "She said if it was turned off, it would not be washed correctly or cleaned well." "I asked her if I could have -- if I was going to use the padlocks because I aways had seven padlocks when I was working the lines," "[a]nd she told me, no, I was not to use them." When asked if she ever expressed any concern with management about the open sprockets on the belt, Elvia responded, "I only told the supervisor, but she said that it had always been washed like that, and there was nothing she could do."

Elvia was injured on August 30, 2024. She was washing the belts with the power-hose, and "couldn't pull the hose anymore," it was "stuck under the belt." Elvia stated,

I was grabbing the hose with . . . my right hand. Because of the pressure, I -- when I went to pull the hose, because of the pressure, I pulled it, but not too hard, and then everything happened so fast that when I -- I kind of started losing my balance. And then everything happened so fast that when I realized it, my hand was already on the belt.

Upon further questioning by the compensation court, Elvia stated, "[W]hen I was pulling the hose, I kind of lost my balance, and I tried to fall. And everything was -- happened so fast that at some point, the band -- the belt grabbed my glove." The belt had only grabbed Elvia's glove at that point, so she yelled for help. "Loris" tried to shut off the belt, but instead "it started going faster" and "it took my hand under the roller." By the time the belt was shut off, it had "already ground my fingers." "Diego [Matias] came in" and "I was almost fainting because of the pain, but he's the one who helped me pull the belt and got my hand out." Elvia remembered falling to the floor and that Matias carried her. She lost consciousness because of the pain.

Elvia was taken to site manager Aureliano Diaz' office, and then Elvia's partner (who also worked for Packers) came to the office. No ambulance was called, but Diaz eventually drove her and her partner to the hospital in Crete. Because the hospital in Crete did not have a specialist, they sent Elvia via ambulance to a hospital in Omaha, Nebraska, where a surgeon had to surgically amputate the index and middle fingers on her left hand.

Diaz went to Elvia's house on the morning of Saturday, September 7, 2024, to take her statement. On September 21, Diaz informed Elvia that her employment was terminated because, after an investigation, it was determined that she violated the rules.

Elvia believed that she was following the safety rules on the date of the incident. "I always followed the rules. Yes, in the meetings, they always talked about safety, told us to be careful, to work safely. They talked about locking the machinery, use the correct equipment so that we wouldn't be -- suffer any burns or any type of accident." She stood an "arm's length" away from the machine when she rinsed the line with the sprocket/roller on top of the belt. But she never used the lockout/tagout on lines 1 and 2.

Loris Pena Santos (Pena) did not testify at trial, but her deposition testimony was received into evidence. Pena testified that she was currently a supervisor for Packers but had been a "team leader" in August 2024. Pena stated that "back then," the supervisor "would demand" that the employees clean the belts while they were running, and "would get upset if we didn't turn them on while we were washing them." A supervisor previously "got very upset" when Elvia "accidently hit a button or a sensor, and it turned off during the first rinse." While working on August 30, Pena heard Elvia screaming. Pena ran to Elvia's machine to turn off the belt, but "[w]hen I would push the button to turn it off . . . it would run even faster," so "I had to hit the emergency button where you turn everything off."

The deposition of site manager Diaz was received into evidence. In his deposition, Diaz said he did not recall what Elvia said when she was brought into his office after the incident, just that she said she was in a lot of pain; she did not tell him how the incident happened. (Later in his deposition, Diaz stated that Elvia was screaming, "'The conveyor caught me.'") Diaz did not call an ambulance and instead drove Elvia and her "husband" and daughter to the hospital in Crete. After the hospital determined that Elvia needed to go to Omaha, Diaz claimed he drove Elvia and her family to Omaha. During the drive, Diaz said he heard Elvia's "husband" ask her, "'Why didn't you pay attention to what you were doing?'" Elvia then "made the comment she -- 'I didn't realize I had placed my hand on the conveyor.'"

However, when Diaz testified at trial, he said that when Elvia's coworkers brought her into his office, she "just stated that her fingers got caught." He confirmed that in his deposition he testified that he transported Elvia and her husband to the hospital in Crete and then to the hospital in Omaha. However, after his deposition, Diaz was presented with a document showing that Elvia was transported from the hospital in Crete to the hospital in Omaha via ambulance. That changed his recollection of how transportation occurred, and he now claimed he overheard the conversation between Elvia and her husband enroute to the hospital in Crete. He testified that Elvia never told him that she was pulling on a hose, lost her balance, and fell towards the machine.

In his deposition, Diaz stated that the night after the incident, corporate instructed him to "continue the investigation progress with pictures of all angles," "and checking and verifying the disconnects were working and everything was in proper working condition." Diaz' investigation revealed that "[t]he exposure to the sprocket and the conveyor, the equipment is not protected properly." He also confirmed that, in addition to the pinch point not being properly guarded, the lockout/tagout equipment was defective (the lockout/tagout for the belt was broken, but the one for the overall machine was still functioning). "[M]y best, I guess, scenario . . . from what I've seen" is that as Elvia was spraying the conveyor, "she got underneath, placed her hand here, and --

- 4 -

and put it right on the conveyor" and the roller "caught her"; Diaz confirmed that he was "assuming."

On September 7, 2024, Diaz went to Elvia's home to get her statement regarding the incident. Their conversation was recorded, and it was subsequently transcribed in English. Both the recording and the English transcription were received in evidence. The transcription reveals that during the conversation, Elvia made the following statements. "I was washing a conveyor belt and, I don't know at what moment, but… when I felt the belt start to pull me, first my glove and then, well my hand I felt it started to squash it, then at that moment I started to scream asking for help." (Ellipses in original). "I was washing the belt," "[b]ut I don't know at what moment I put my hand there and, well, since the belt was running, then, well, I felt it and it started pulling my glove." "[E]verything happened so fast that all of a sudden I just felt that the belt was pulling me."

John Priester, Packers' North American director of field safety, confirmed that the normal process is to clean the bacon press belt while it was running. He explained, "With that belt specifically, there's some harborage points that are beyond the sprockets and that are beyond the tensioner areas," "[a]nd the belt running allows the water to help penetrate and remove those soils." The bacon press equipment "does have a sanitation mode which allows the belt to run much slower than during production mode." An employee may need to get within an arm's length of the equipment, but if they do, "they are supposed to lockout that piece of equipment, verify that all energy sources are isolated or off before they get within that arm's length."

Priester was involved in the investigation of the August 30, 2024, incident. He went to the Crete location "[w]ithin a week or two of the accident." Priester looked at the specific piece of equipment where the accident occurred and compared it to other bacon presses in the area. He also observed the area, talked to other team members who were involved with cleaning those areas, talked to maintenance, talked to Smithfield Foods' safety manager, and talked to Packers' local management team. He did not speak with Elvia. According to Priester, there were no eyewitnesses to the accident. There was video, "but it's inconclusive," "[i]t's completely steamed out," "[y]ou can't see anything past 2 or 3 feet off the camera lens."

Priester's investigation showed that the incident occurred on line 1, where "the belt return was under the tension." The unguarded pinch point was not identified in Packers' assessments; however, unguarded pinch points are part of the reason for the arm's length rule. During the investigation, it was determined that there was an inoperable lockout point on that specific area of the belt. However, there was a main control panel "roughly 6 feet away" that would shut down the entire bacon press.

Priester stated, "We utilize what we see in person, in past experiences, past events that are similar to this" and "we pull it all in" to come up with an explanation as to how the accident occurred. As part of its regular process, Packers prepared demonstrations of how it believed the accident occurred. Those demonstrations, a picture and video, were received in evidence; however, Priester acknowledged that the picture was of a different belt, with the belt going over the tension roller rather than under the roller, as was the case on line 1 where the injury occurred.

Packers' Accident Investigation Summary and Call Script was received into evidence. It contains the following statements: "[Elvia] placed her hand on the framework to balance herself, her hand slid down to the running belt and became caught"; "[b]roken LOTO tab on the metal detector belt"; "[u]nguarded pinch point"; "[t]eam member not staying arm's length from running

- 5 -

belt"; "[t]eam member was performing first rinse of the bacon press metal detector belt and utilized the framework to hold onto while using the hose to move debris from under the belt"; "[u]sing the framework for balance"; "[l]ost awareness of where hand was on framework"; "lost awareness of how close she was to the running belt"; "became too close to the running belt unaware of truly how close she was while working to push the scraps from under the belt."

Priester testified that Elvia was terminated for failing to follow Packers' lockout/tagout policy and procedure when going within an arm's length of a piece of running equipment. When asked if he was suggesting that Elvia knew what she was doing, that she put her hand on the frame but should have done a lockout/tagout, Preister replied, "Correct."

Among the other exhibits received into evidence were a disciplinary report from all divisions within the Packers' organization in 2024, and disciplinary reports and termination forms for other employees who violated the safety rules at the Crete location in 2024.

## 2. COMPENSATION COURT'S RULING

On September 30, 2025, the compensation court entered an award in Elvia's favor. It awarded her temporary total disability, permanent partial disability, medical expenses, future medical care, a 50-percent waiting-time penalty, $22,250 in attorney fees, and interest. Regarding the penalties for late payment of disability benefits, the court found that there was no reasonable controversy as to whether Elvia was willfully negligent in violating the safety rules; Packers' willful negligence defense hinged entirely on its "alternative version" of what happened, but that narrative was based on speculation unsupported by facts.

Packers appeals.

## III. ASSIGNMENTS OF ERROR

Packers assigns that the compensation court erred by finding it liable for a penalty, attorney fees, and interest when there was a reasonable controversy as to Elvia's entitlement to benefits.

On cross-appeal, Elvia assigns that the compensation court erred by failing to award her costs.

## IV. STANDARD OF REVIEW

An appellate court may modify, reverse, or set aside a Workers' Compensation Court decision only when (1) the compensation court acted without or in excess of its powers; (2) the judgment, order, or award was procured by fraud; (3) there is not sufficient competent evidence in the record to warrant the making of the order, judgment, or award; or (4) the findings of fact by the compensation court do not support the order or award. *Mosher v. Whole Foods Market*, 317 Neb. 26, 8 N.W.3d 733 (2024).

In testing the sufficiency of the evidence to support the findings of fact in a workers' compensation case, every controverted fact must be resolved in favor of the successful party and the successful party will have the benefit of every inference that is reasonably deducible from the evidence. *Id.*

Whether a reasonable controversy exists is a question of fact. *Id.* Accordingly, we review for clear error the compensation court's findings concerning reasonable controversy underlying its determination of waiting-time penalties. *Id.* However, if the facts are not in dispute and the

- 6 -

inference is clear such that reasonable people could not disagree about the matter, whether a reasonable controversy exists is a question of law. *Id.*

## V. ANALYSIS

### 1. PACKERS' APPEAL

#### (a) General Propositions of Law

Compensability under the Nebraska Workers' Compensation Act, Neb. Rev. Stat. §§ 48-101 to 48-1,117 (Reissue 2021), is determined by § 48-101, which provides:

> When personal injury is caused to an employee by accident or occupational disease, arising out of and in the course of his or her employment, such employee shall receive compensation therefor from his or her employer if the employee was not willfully negligent at the time of receiving such injury.

See *Mosher v. Whole Foods Market, supra*. Section 48-151(7) defines "[w]illful negligence" as "(a) a deliberate act, (b) such conduct as evidences reckless indifference to safety, or (c) intoxication at the time of the injury, such intoxication being without the consent, knowledge, or acquiescence of the employer or the employer's agent."

Under § 48-120, the employer is liable for reasonable medical, surgical, and hospital services. Additionally, a workers' compensation claimant may receive permanent or temporary benefits for either partial or total disability. *Mosher v. Whole Foods Market, supra*. See, also, §§ 48-121 and 48-125.

Section 48-125 authorizes a 50-percent penalty payment for waiting time involving delinquent payment of compensation and an attorney fee, where there is no reasonable controversy regarding an employee's claim for workers' compensation. *Picard v. P & C Group 1*, 306 Neb. 292, 945 N.W.2d 183 (2020). The Nebraska Supreme Court has stated:

> Although "reasonable controversy" appears nowhere in the text of § 48-125, the phrase has been part of our jurisprudence for more than 90 years, and we have presumed that the Legislature acquiesced in such determination of the Legislature's intent because it has never amended the Nebraska Workers' Compensation Act to address reasonable controversy. Our case law has long held that the waiting-time penalty and attorney fees are available under § 48-125 in cases brought to the Workers' Compensation Court only "where there is no reasonable controversy regarding an employee's claim for workers' compensation."

*Mosher v. Whole Foods Market*, 317 Neb. at 47, 8 N.W.3d at 751.

Pursuant to § 48-125(3), "Fifty percent shall be added for waiting time for all delinquent payments after thirty days' notice has been given of disability or after thirty days from the entry of a final order, award, or judgment of the Nebraska Workers' Compensation Court[.]" Section 48-125(4)(a) provides for "a reasonable attorney's fee" when the employer "refuses payment of compensation or medical payments" and "proceedings are held before the compensation court." *Mosher v. Whole Foods Market, supra*. The Nebraska Supreme Court has recognized that the waiting-time penalty provided for in § 48-125(3) relates only to delinquent

payments of compensation, which includes "'periodic disability or indemnity benefits,'" and that the statute does not authorize a waiting-time penalty for delinquent payment of medical expenses. *Boring v. Zoetis LLC*, 309 Neb. 270, 277, 959 N.W.2d 795, 802 (2021). With regard to attorney fees, however, the Nebraska Supreme Court has noted that the Legislature amended the portion of the statute that is now § 48-125(4) to specifically provide for an award of attorney fees related to medical expenses, as well as to compensation. See *Boring v. Zoetis LLC, supra*. Additionally, pursuant to § 48-125(5), when an attorney fee is allowed, interest shall also be assessed against the employer.

It has long been established that the policy of liberal construction of the Nebraska Workers' Compensation Act for the benefit of the claimant is the rule in Nebraska. See *Mosher v. Whole Foods Market, supra*. The Nebraska Workers' Compensation Act should be construed liberally to carry out its spirit and beneficent purpose of providing compensation to employees injured on the job. *Id.* The Nebraska Supreme Court has explained that the purpose of § 48-125 is to encourage prompt payment of workers' compensation benefits by making the delay costly if an award is finally established. See *Mosher v. Whole Foods Market, supra*.

(b) Was There a Reasonable Controversy?

Packers did not appeal the compensation court's award of benefits in Elvia's favor on the underlying claim. "The appeal is limited to challenging only the trial court's award of a penalty, attorney fee and interest, which are only appropriate when there is no reasonable controversy as to the employee's entitlement to benefits." Reply brief for appellant at 5. Packers claims there was a reasonable controversy as to Elvia's entitlement to benefits based upon the evidence presented regarding the safety violation defense.

A "reasonable controversy" for the purpose of § 48-125 exists (1) if there is a question of law previously unanswered by the Supreme Court, which question must be answered to determine a right or liability for disposition of a claim under the Nebraska Workers' Compensation Act, or (2) if the properly adduced evidence would support reasonable but opposite conclusions by the compensation court about an aspect of an employee's claim, which conclusions affect allowance or rejection of an employee's claim, in whole or in part. *Mosher v. Whole Foods Market, supra*. To avoid statutory penalties, an employer need not prevail in the employee's claim, but must demonstrate an actual basis in law or fact for disputing the claim and refraining from payment of compensation. *Id.* Whether a reasonable controversy exists is a question of fact. *Id.*

It is the employer's burden to prove willful negligence on the part of the employee. *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000). See, also, § 48-107. In order to avoid liability on the basis that the employee was willfully negligent, an employer must prove a deliberate act knowingly done or at least such conduct as evidences a reckless indifference to the employee's own safety. *Guico v. Excel Corp., supra*. Mere negligence is not sufficient. *Id.* The conduct of the employee must manifest a reckless disregard for the consequences coupled with a consciousness that injury will naturally or probably result. *Id.* Reckless indifference to safety means more than want of ordinary care. It implies a rash and a careless spirit, not necessarily amounting to wantonness, but approximating it in degree—a willingness to take a chance. *Id.*

In *Guico v. Excel Corp., supra*, the Nebraska Supreme Court addressed willful negligence in the context of a worker's violation of a specific safety rule promulgated by an employer. In its

analysis, the court utilized Professor Larson's treatise, 2 Arthur Larson & Lex K. Larson, Larson's Workers' Compensation Law (2000). The court stated,

> Professor Larson discusses several factors which courts have considered in determining whether the violation of an employer's safety rule should disqualify a worker from benefits, both under statutes which afford a general "willful misconduct" defense and those which specifically provide a defense for safety rule violations. Summarized and restated, these factors include (1) whether an employer has a reasonable rule designed to protect the health and safety of the employee, (2) whether the employee has actual notice of the rule, (3) whether the employee has an understanding of the danger involved in the violation of the rule, (4) whether the rule is kept alive by bona fide enforcement by the employer, and (5) whether the employee has a bona fide excuse for the rule violation.

*Guico v. Excel Corp.*, 260 Neb. at 720-21, 619 N.W.2d at 477. However, "the factors discussed in *Guico* apply to cases in which an employee has intentionally violated an employer's safety rule and consequently becomes injured." *Spaulding v. Alliant Foodservice*, 13 Neb. App. 99, 107, 689 N.W.2d 593, 602 (2004). The five factors in *Guico* are not applicable if the employee's rule violation was unintentional. See *Spaulding v. Alliant Foodservice, supra.*

*(i) Compensation Court's Findings*

The compensation court recounted that Elvia testified she lost her balance while pulling the high-pressure hose, but Packers asserted that Elvia's testimony was not credible. Packers offered testimony and evidence of an alternative narrative of what happened to support its allegations of willful negligence. Priester testified as to the alternative narrative, relying on Packers' Accident Investigation Summary and Call Script which was completed on September 20, 2024. According to that document,

> Elvia had worked her way from the top of the area down the side of the belt and was working to push meat scraps from under the belt to an open area when she placed her hand on the framework to balance herself, her hand slid down to the running belt and became caught.

Priester testified that the origin of the narrative came from a recorded statement of Elvia, which was taken by Diaz on September 7. However, the compensation court "carefully reviewed" the statement given by Elvia to Diaz on September 7 and found that "the defendants' narrative does not match what [Elvia] said in her statement to Diaz." The court stated, "At best, the defendants' narrative about what happened is an assumption of what 'might' have happened," "[i]t is speculative." And "Priester's later trial testimony affirms that it was speculation."

The compensation court also stated, "The analysis of the origins of the defendants' narrative as found in the Accident Investigation Summary and Priester's testimony exposed gaps between facts provided from Crete witnesses and . . . corporate opinions," and "[t]he corporate opinions were untethered from necessary factual support." Again, the compensation court found the defendants' narrative of what happened "speculative, at best." "The narrative did not prove that [Elvia] was willfully negligent."

Additionally, the compensation court found that the Accident Investigation Summary and Call Script "contains evidence that disproves [Packers'] theory that [Elvia] was willfully negligent." "After the narrative of 'how' this accident happened, the Investigation Summary lists three contributing factors of 'why' this accident happened": (1) "the belt running during cleaning and the defective LOTO points"; (2) the unguarded pinch point and the conveyor belt running under the tensioner; and (3) Elvia was "using the framework for balance" and "was working downwards to the floor and lost awareness of how close she was to the running belt." The court noted that in the "Incident Conclusion," Packers repeated that "'our team member was working around the running equipment and became too close to the running belt UNAWARE of truly how close she was . . .'" (Emphasis supplied by compensation court.) The court found: "These statements by Packers are, at most, evidence of momentary inadvertence and ordinary negligence. They do not come close to deliberate acts evidencing a reckless indifference to safety." The court found that Packers did not meet its burden of proving that Elvia was willfully negligent at the time of her injury.

The compensation court found that Elvia was entitled to a waiting-time penalty because there was no reasonable controversy regarding Elvia's claim for workers' compensation benefits. There was no question of law previously unanswered. And the evidence adduced as to Packers' "alternative version" of events "was found wanting." The narrative was based on "speculation unsupported by facts," and "[t]he lack of factual support cannot support a reasonable opposite conclusion." The "narrative failed on its own."

### (ii) No Clear Error

Packers contends the compensation court's decision "clearly shows a complete misinterpretation of the reasonable controversy doctrine." Brief for appellant at 18. Packers argues that it produced evidence supporting its position as to each of the five criteria of the safety violation defense, see *Guico v. Excel Corp.*, 260 Neb. 712, 619 N.W.2d 470 (2000), and Elvia's evidence supported a different conclusion. However, the compensation court's "adoption of [Elvia's] evidence over Packers' evidence does not mean there was no other conclusion that could be reached and does not make a penalty appropriate." Brief for appellant at 18. Packers points to credibility issues and argues that an analysis of the five factors shows that the evidence presented a reasonable controversy.

Packers' Accident Investigation Summary and Call Script states more than once that Elvia "lost awareness" or was "unaware" of how close she was to the running belt. The compensation court did not clearly err when it found that these statements were, at most, evidence of momentary inadvertence or ordinary negligence, and that Packers failed to meet its burden to prove Elvia was willfully negligent at the time of her injury. With no finding of intentionality, the five factors in *Guico v. Excel Corp., supra*, are not applicable. See *Spaulding v. Alliant Foodservice, supra* (five factors in *Guico* are not applicable if employee's rule violation was unintentional).

The compensation court did not clearly err in finding that Elvia was entitled to a waiting-time penalty because there was no reasonable controversy regarding her claim for workers' compensation benefits. See *Mosher v. Whole Foods Market*, 317 Neb. 26, 8 N.W.3d 733 (2024) (whether reasonable controversy exists is question of fact; appellate court reviews for clear error compensation court's findings concerning reasonable controversy underlying its

determination of waiting-time penalties). To avoid statutory penalties, an employer need not prevail in the employee's claim, but must demonstrate an actual basis in law or fact for disputing the claim and refraining from payment of compensation. *Id.* As noted by the compensation court, there was no question of law previously unanswered. And the compensation court did not clearly err when it found that Packers' own narrative of what happened failed to prove that Elvia was willfully negligent.

Because there was no reasonable controversy, the compensation court did not clearly err in finding that Elvia was entitled to statutory waiting-time penalties, attorney fees, and interest pursuant to § 48-125. Accordingly, we affirm the compensation court's award of the same.

## 2. ELVIA'S CROSS-APPEAL

On cross-appeal, Elvia points out that the compensation court's award was silent as to costs. She argues that, given the court's award of attorney fees, the court should have also awarded her costs, but it "presumably made an inadvertent mistake." Brief for appellee at 59. Elvia asks this court to "remand the matter with instructions to increase the amount of the award by the amount of [her] permissible costs." Reply brief for appellee at 5.

Section 48-172 states, in relevant part:

When a reasonable attorney's fee is allowed the employee against the employer as provided in section 48-125, the compensation court *shall* further assess against the employer as costs of the employee the cost of depositions if admitted into evidence and may further assess against the employer the fees and mileage for necessary witnesses attending the proceedings at the instance of the employee. Both the necessity for the witness and the reasonableness of the fees shall be approved by the compensation court. Such witnesses shall be reimbursed for their necessary mileage at the rate provided in section 81-1176.

(Emphasis supplied.)

The compensation court awarded Elvia attorney fees pursuant to § 48-125, and we have affirmed that award. Because she was entitled to attorney fees, § 48-172 requires the compensation court to further assess permissible costs against Packers. Packers acknowledges that if an attorney fee is awarded, then "only certain costs" can be awarded. Reply brief for appellants at 21. It contends certain charges claimed by Elvia cannot be assessed against it. Since the award was silent as to costs, we remand the matter to the compensation court with directions to further award Elvia her permissible costs.

## VI. CONCLUSION

For the reasons stated above, we affirm the compensation court's award in favor of Elvia and awarding her waiting time penalties, attorney fees, and interest. However, we remand the matter to the compensation court with directions to further award Elvia her permissible costs.

AFFIRMED IN PART, AND IN PART
REMANDED WITH DIRECTIONS.